UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANA McCURDY, | : | |
| | : | CIVIL ACTION NO. 3:15-CV-2436 |
| Plaintiff, | : | |
| | : | (JUDGE CONABOY) |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.) She alleged disability beginning on December 20, 2011, and remained insured through September 30, 2013.  (R. 18.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Scott M. Staller, concluded in his September 12, 2014, decision that Plaintiff's severe impairments of osteoarthritis, fibromyalgia and complex regional pain syndrome of the bilateral lower extremities, and the non-severe impairment of anxiety disorder did not meet or equal the listings.  (R. 20, 21.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 23-28.)  ALJ Staller therefore found Plaintiff was not disabled from December 20, 2011, through September 30, 2013.

(R. 29.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded because his RFC determination is not supported by the record.  (Doc. 16 at 9.) After careful review of the record and the parties' filings, I conclude this appeal is properly granted.

## I. Background

*A.    Procedural Background*

Plaintiff protectively filed for DIB on December 5, 2012.  (R. 18.)  The claim was initially denied on March 1, 2013, and Plaintiff filed a request for a hearing before an ALJ on April 12, 2013.  (*Id.*)

ALJ Staller held a hearing on August 19, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Andrew Caporale.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on September 12, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 29.)

Plaintiff's request for review of the ALJ's decision was dated October 6, 2014.  (R. 11-14.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on October 22, 2015.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On December 18, 2015, Plaintiff filed the action in this Court

appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her Answer and the the Social Security Administration Transcript on February 24, 2016.  (Docs. 12, 13.)  Plaintiff filed her supporting brief on May 11, 2016.  (Doc. 16.)  Defendant filed her brief on July 11, 2016.  (Doc. 20.)  Plaintiff filed a reply brief on July 25, 2016.  (Doc. 21.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   Factual Background**

Plaintiff was born on March 21, 1963, and was fifty years old on the date last insured.  (R. 28.)  She has a high school education and has past relevant work as a corrections officer.  (R. 28, 47.)

**1.   Impairment Evidence**

Because Plaintiff's claimed error focuses on the ALJ's consideration of bilateral lower extremity complex regional pain syndrome/reflex sympathetic dystrophy ("CRPS/RSD") (Doc. 16 at 13-14), the Court's review of medical evidence will do the same.

Records from Martin Hudzinski, M.D., of Greencastle Family Practice indicate that Plaintiff's RSD was stable as of September 20, 2010, and she was using "some sort of pain rub" which she had gotten from her mother and found helpful.  (R. 203.)  Dr. Hudzinski did not record any problems in his physical examination findings except for possible lipomas of various sizes under the skin of both arms.  (R. 204.)  Three months later he noted that Plaintiff's RSD

3

in the ankle had been about the same`and she continued to use the pain rub.  (R. 205.)

After experiencing some problems following an accident in early 2011 (R. 208-11), Dr. Hudzinski noted on January 24, 2011, that the accident-related pain in her left leg had resolved and Plaintiff was "back to baseline for her RSD."  (R. 214.)  He stated that she was not scheduled to work until January 30, 2011, and he thought it a "reasonable return to work date."  (*Id.*)  (At the time Plaintiff worked doing inventory with RGIS and her job included lifting boxes and climbing ladders.  (R. 36, 209.))

On December 31, 2011, Plaintiff reported to Dr. Hudzinski that she had a numbing sore pain in her left arm, ankles, knees, and left hip and the pain rub was not working as well as it had been. (R. 219.)  He noted that Plaintiff reported the pain was aggravated by weather changes and she was not taking any medications for pain. (*Id.*)  He also noted that Plaintiff was still working at RGIS. (*Id.*)  Examination of Plaintiff's extremities was normal with full range of motion bilaterally.  (R. 220.)  In his Assessment regarding reflex sympathetic dystrophy of the lower limb, Dr. Hudzinski commented "[w]ould check in health food store for tumeric and bromelain, which have been known to relieve pain."  (R. 221.)

At her January 3, 2012, visit, "chronic RSD of left lower limb" was noted and Plaintiff reported that she felt it was getting worse.  (R. 200.)  "Follow up" indicated "note for work today and

4

tomorrow if needed." (R. 202.)

On June 22, 2012, Plaintiff presented as a new patient to Jacqueline M. Fignar, D.O., at Summit Physician Services. (R. 291.) Plaintiff complained of pain in her bilateral shoulders and her legs, left greater than right, and pain in her upper back. (R. 291.) She reported that she sometimes took Percocet and, although it made her tired and put her "out," it did help at times. (R. 292.) Plaintiff was directed to take Tylenol every six hours as needed for pain. (R. 292.) Examination showed that Plaintiff had tenderness in her upper arms, lower extremities, and across her upper shoulders upon palpation. (R. 294.)

On August 22, 2012, Plaintiff reported to Dr. Fignar that her arms and legs were constantly hurting and she stopped taking Gabapentin due to upset stomach. (R. 296.) Plaintiff also reported she was taking Percocet for muscle pain and Dr. Fignar advised that Plaintiff should use it sparingly. (R. 297.) Physical examination included a finding that Plaintiff had tenderness along the anterior thighs. (R. 297.) At her October and November visits, Dr. Fignar's examination showed 5/5 motor strength and 2/4 deep tendon reflexes in both upper and lower extremities. (R. 302, 304.)

On November 18, 2012, Plaintiff suffered an "avulsion fracture dorsum of the navicular (Outside)" of the right foot when she tripped and fell on the stairs at home. (R. 277.) Najour Faour,

D.P.M., of Robinwood Orthopaedic Specialty Center saw her on November 19, 2012, and recommended conservative treatment including immobilization, rest, ice, elevation of the foot and ankle, and the use of a walking boot full-time.  (R. 280.)  Dr. Faour noted that Plaintiff walked "with a normal, non-antalgic gait." (R. 277.)  He also noted that she had a left navicular fracture, difficulty in walking, painful foot, and sprain of the left ankle and foot.  (R. 277, 279.)

On December 28, 2012, Plaintiff presented to discuss paperwork for possible disability and brought a form for functional capacity testing.  (R. 310.)  Dr. Fignar said she did not do this in the office and suggested it be done by physical therapy.  (*Id.*)  Plaintiff said she was willing to do this.  (*Id.*)  Dr. Fignar recorded that Plaintiff stated "in the past she has had a diagnosis of reflex sympathetic dystrophy in her leg and ankle.  Patient states this occurred on the left ankle in 2004.  Patient states that she had fallen at work and fractured it when it occurred and was treated by Greencastle Family Practice."  (*Id.*)  Dr. Fignar added that she "did not see anything in the records, however the records only go back to 2008/2009 timeframe that where sent over." (*Id.*)  Plaintiff said at the time of the visit she was experiencing pain in her right ankle after having fallen down the stairs on November 18, 2012, and she was afraid she would get RSD in this ankle.  (*Id.*)  She was still wearing a boot for the injury and said

6

she had not yet heard from podiatry and needed an appointment.  (R. 310.)  Notes from this office visit include Dr. Fignar's comment "[a]s for history of RSD in the left ankle I have no mention of it in her records from [her] last pcp.  I advised patient that she should get records for this issue."  (R. 311.)

On January 17, 2013, Plaintiff saw John Sekel, D.P.M., of Scotland Podiatric, P.C., for follow up of her right ankle and foot.  (R. 342.)  She reported greater pain without the boot, relating that "it felt similar to her RSD on the left foot a number of years ago."  (*Id.*)  Dr. Sekel noted that he reviewed Plaintiff's x-rays which did not show any signs of fracture or dislocation and the previous chip fracture was consolidated.  (*Id.*)  He recommended "PT for RSD of the right ankle and pain management for sympathetic nerve block of the lower leg."  (*Id.*)  He added that he would forward the information to her PCP for referral for pain management, noting that Plaintiff was then enrolled at Peak Performance for physical therapy.  (*Id.*)

Plaintiff returned to Dr. Fignar on February 5, 2013, presenting with complaints of her right foot giving out.  (R. 347.)

> The patient states that she has been having pain in her right foot and ankle since her fracture of her navicular bone in her foot. The patient has been seeing podiatry for this and states that she is concerned that she may have RSD.  She states she had RSD in her left lower extremity a number of years ago and states that it feels very similar in the right foot and ankle.  The patient states the pain in her ankle and foot keeps her up at

7

> night and causes her to almost fall.  She
> states that her right foot and ankle seem to
> be giving out and she feels like she cannot
> put any weight on it.  The patient states
> that the foot will swell and will hurt when
> the sheets on the bed touch it.  She states
> that during the day she feels that her foot
> may even change color at times and states
> that her foot will tingle and burn.  It was
> recommended by podiatry that patient see
> physical therapy for possible RSD of the
> right ankle and foot and also pain
> management.

(*Id.*)  Physical examination showed full range of motion of the ankle as well as no swelling over the ankle or foot, no tenderness to palpation over the sole of the foot or dorsum of the foot, excellent pedal pulses, no edema, no ecchymosis, normal color, and warm and dry skin.  (R. 348.)  Dr. Fignar recommended a cane, physical therapy evaluation and treatment, and neurology and pain management consultations.  (*Id.*)  Naprosyn and Percocet as needed for pain were the noted medications.  (*Id.*)

On April 19, 2013, Plaintiff saw John Paul Malayil, M.D., of Summit Pain Medicine who noted that Plaintiff had been seen in March 2013 and she was being followed for reflex sympathetic dystrophy of her right lower foot having had a right ankle sprain and fracture in November of 2012.  (R. 529.)  His office notes set out the following review:

> She states that after receiving her lidocaine
> 5% ointment she states that is giving
> her significant relief of a lot of her pain
> symptoms.  She does use this about 3-4 times
> a day and she is very happy with effects that
> she is having from the pain relief she is

8

> obtaining.  In terms of her other
> medications, she is currently using Percocet
> 5/325 mg 1-2 tablet a day as necessary.  (R.
> 519.) . . . She denies any significant side
> effects from this medication and states that
> she only uses it when she is doing activity
> that will increase a lot of foot pain.  In
> terms of the pain symptoms, she describes the
> pain as still being tingling in nature as
> well as having shooting pains and having a
> lot of sensitivity to her right foot along
> the dorsum of her foot.  She also states that
> she has noticed some pain in her right knee
> that is similar to the RSD type symptoms that
> she was having before.  She has not had a
> chance to obtain her TENS unit from physical
> therapy as she did have many different
> activities going on at home and did not have
> a chance to get to the physical therapy
> center.  In terms of her current pain, she
> states on a daily basis her pain is about
> 5/10 and it is still quite bothersome to her
> but she has at least now progressed to the
> point that she can wear slippers and shoes
> without much difficulty.

(R. 519.)  Examination of the right foot "showed a little bit of a
significant decrease in temperature as compared to the last exam,"
some mild discoloration throughout the lower foot, definite
sensitivity to light touch, allodynia and hyperesthesia along the
dorsum, and dorsiflexion and plantar flexioin within normal limits
but some mild pain with plantar flexion; the left foot examination
showed normal temperature and no color changes.  (*Id.*)  Dr. Malayil
laid out the following plan:

> At this point in time I spoke to the
> patient about the various therapeutic options
> moving forward.  In terms of a multimodal
> approach, we will go ahead and schedule this
> patient for a right L3 lumbar sympathetic
> nerve block to help with her CRPS type pain

9

> syndrome. . . . In addition, we will continue
> her with the lidocaine 5% ointment as well as
> the Percocet 5/325 1 tablet every 12 hours as
> needed. . . . In the future we will go ahead
> and transition this over to a long-acting
> medication once we have the pain somewhat
> under control.

(*Id.*)  Plaintiff was continued on this plan at her May visit.  (R. 536.)

Dr. Malayil performed the nerve block on May 31, 2013.  (R. 530.)  At her July 12, 2013, visit, Plaintiff reported significant relief of her right lower extremity pain and her right foot pain for approximately a month and a half but the pain had started to come back.  (*Id.*)  She also reported that for the month of June, she was able to walk around without significant pain localized in her right foot--she was pleased with this as well as having some range of motion of her right foot.  (*Id.*)  Plaintiff said that her pain symptoms at the time of the visit were similar to those she had before.  (*Id.*)  Dr. Malayil noted that Plaintiff had "what appears to be reflex sympathetic dystrophy of her right lower extremity and she does have pain symptoms that are similar to the burning type pain symptoms and neuropathic pain that she was having before but it is a little bit better at this point in time."  (*Id.*)  Examination of the right foot showed "a little bit of increased sensitivity, however not as much as before," no significant temperature changes, and range of motion within normal limits.  (*Id.*)  Dr. Malayil planned to continue with medication

management and consider a second lumbar sympathetic nerve block as well as putting Plaintiff on a regimen where she would get a block every three to four months for relief of her right foot pain. (*Id.*)

Plaintiff reported worsening symptoms and pain in her left foot at her August 2013 visit with Dr. Malayil.  (R. 533.) Examination showed allodynia and hyperesthesia along the medial aspect of both the right and left foot, no significant discoloration or temperature changes, range of motion within normal limits for the most part, and pulses were felt bilaterally.  (*Id.*) Dr. Malayil planned to schedule a right L3 lumbar sympathetic block and a left L3 lumbar sympthetic block two weeks after that.  (*Id.*)

Plaintiff had the nerve blocks on September 23, 2013, and reported only three weeks of relief from the right side block and three days relief with the left side block.  (R. 526.)  After being seen at Summit Pain Medicine in December 2013 and January 2014 when she reported that the pain was still very bothersome and intermittent in nature and Dr. Malayil noted that she had signs and symptoms of CRPS of both her right and left lower extremities (*id.*), Plaintiff reported in February that she had a burning, aching constant type of pain which may have been aggravated by cold temperatures and increased driving.  (R. 527.)  Plaintiff also described pain that traveled from her hip down to her foot.  (*Id.*) Low back examination showed some tenderness to palpation along the

11

left lower facet joints.  (*Id.*)  Extremity examination showed 5/5 strength in her right lower extremity and somewhat diminished strength on the left--knee extension and ankle dorsiflexion indicated more L3-L4, L4-L5 issues.  (*Id.*)  Straight leg test was positive on the left side for reproducing pain down her left lower extremity.  (*Id.*)  Dr. Malayil planned to order a lumbar spine MRI to evaluate her lower extremity radiculopathy and continue Plaintiff's medication regimen to address her RSD symptoms.  (*Id.*) The lumbar spine MRI performed on February 19, 2014, showed no abnormality.  (R. 524-25.)

On February 28, 2014, Dr. Malayil noted that Plaintiff still had pain localized to her feet, with her left foot "definitely a lot worse" than right.  (R. 522.)  Plaintiff described the pain as burning, throbbing, numbness, and stinging sensation on the top of her foot as well as along the lateral aspect of her foot.  (*Id.*) Examination showed tenderness to palpation along the left dorsum, pain to palpation along the medial and lateral aspect of her left foot, increased sensitivity, hyperesthesia, and allodynia, plantar flexion and dorsiflexion were within normal limits, and pulses were felt.  (*Id.*)  Dr. Malayil planned to continue medication management and administer another left L3 lumbar nerve block.  (*Id.*)

In March, Plaintiff's reports of pain were similar and Dr. Malayil noted that bilateral foot examination was unchanged from the previous visit and the nerve block was planned for May.  (R.

516.)  In April, Plaintiff described her pain as burning, severe aching-like pain localized to both lower extremities and she reported that she took up to two Percocet tablets daily for her pain symptoms if she was walking "a good deal" that day; the foot examination was again unchanged from the previous visit.  (R. 516.) On May 28, 2014, Dr. Malayil noted that he had performed a left L3 lumbar sympathetic nerve block on May 17, 2014, from which Plaintiff experienced "very good relief from that aspect and she states that she is having pain localized to her left knee" that was more aching-like and of relatively new onset.  (R. 512.)  Left knee examination revealed no significant changes, range of motion within normal limits, and some mild tenderness to palpation along the anterior aspect over the knee.  (R. 513.)  The plan was to continue with medication management and get an x-ray of the left knee if the pain symptoms persisted.  (*Id.*)

On July 28, 2014, Plaintiff reported to Dr. Malayil that her pain symptoms had been worsening over the past one to two months. (R. 541.)  She noted that, although the nerve blocks had helped, she had a localized burning-like pain in the bottom and top of her feet if she walked more than twenty minutes, right more than left. (*Id.*)  Dr. Malayil noted that Gabapentin and Lyrica had not provided much benefit and had increased side effects.  (*Id.*)  He planned to continue medication management and administer another right L3 lumbar sympathetic nerve block.  (*Id.*)

13

2. **Opinion Evidence**

The only opinions of record are from State agency consultants John Gavazzi, Psy.D., and Candelaria Legaspi, M.D. (R. 57-60.) On February 4, 2013, Dr. Gavazzi opined that Plaintiff's anxiety related disorders were not severe. (R. 57-58.) On March 1, 2013, Dr. Legaspi opined that Plaintiff was capable of medium work with no nonexertional limitations. (R. 59-60.)

3. **Function Report and Hearing Testimony**

In her January 19, 2013, Function Report, Plaintiff indicated her ability to work was limited because the RSD in both legs made it difficult to walk at all, she could stand for approximately five minutes, and she could not sit for more than twenty minutes without pain. (R. 144.) She added that anemia caused her to fall asleep frequently. (R. 144-45.)

At the August 19, 2014, hearing, Plaintiff testified that she could drive depending on the pain in her foot and leg. (R. 34.) She said she could not walk more than ten minutes at a time without her feet burning to the point where they felt like they were on fire. (R. 38.) Plaintiff also said that she cannot do anything on a bad day--she just takes Percocet for the pain or takes a hot bath, uses numbing cream and keeps her legs elevated for about two hours. (*Id.*) She later testified that she usually used the numbing cream at least twice a day and kept her legs elevated for two hours each time as she had been instructed. (R. 45-46.)

14

ALJ Staller asked VE Caporale whether Plaintiff's past relevant work could be done by a hypothetical fifty-one year old with past relevant work as a corrections officer and a high school education who could perform no greater than light work and could occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl. (R. 47-48.) The VE testified that the hypothetical person could not perform the past relevant work but other jobs would be available for such a person in the national economy including marker, cleaner-housekeeping, and conveyer-line bakery worker. (R. 48-49.) ALJ Staller then asked whether there would be transferrable skills from Plaintiff's past relevant work if the hypothetical person had the same restrictions set out previously but was reduced to the sedentary level of work. (R. 49.) The VE stated there would not be. (*Id.*) When asked by Plaintiff's attorney whether work would be available for a person who had to raise her legs to waist level or higher at least once during the work day for two consecutive hours, VE Caporale responded there would be no work. (R. 50.)

**4.   ALJ Decision**

As noted above, ALJ Staller issued his decision on September 12, 2014. (R. 18-29.) He made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant last met the insured status requirements of the Social Security Act

15

on September 30, 2013.

2.   The claimant did not engage in
     substantial gainful activity during the
     period from her alleged onset date of
     December 20, 2011 through her date last
     insured of September 30, 2013 (20 CFR
     404.1571 et seq.).

3.   Through the date last insured, the
     claimant had the following severe
     impairments: osteoarthritis,
     fibromyalgia and complex regional pain
     syndrome of the bilateral lower
     extremities (20 CFR 404.1520(c)).

4.   Through the date last insured, the
     claimant did not have an impairment or
     combination of impairments that met or
     medically equaled the severity of one of
     the listed impairments in 20 CFR Part
     404, Subpart P, Appendix (20 CFR
     404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the
     entire record, the undersigned finds
     that, through the date last insured, the
     claimant had the residual functional
     capacity to perform light work as
     defined in 20 CFR 404.1567(b).  The
     claimant is limited to occasional
     climbing ramps and stairs, balancing,
     stooping, kneeling, crouching and
     crawling, and she is prohibited from
     climbing ladders, ropes or scaffolds.

6.   Through the date last insured, the
     claimant was unable to perform any past
     relevant work (20 CFR 404.1565).

7.   The claimant was born on March 21, 1963
     and was 50 years old, which is defined
     as an individual closely approaching
     advanced age, on the date last insured
     (20 CFR 404.1563).

8.   The claimant has at least a high school
     education and is able to communicate in

16

English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security act, at any time from December 20, 2011, the alleged onset date, through September 30, 2013, the date last insured (20 CFR 404.1520(g)).

(R. 20-29.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]   It is necessary for the

---

[1]   "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate

---

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

18

that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993). To show that a claimant is capable of undertaking jobs in the national economy, the Commissioner "must prove that the claimant, although perhaps partially disabled, retains the capacity to work on a 'regular and continuing basis,'" [taking into account] both exertional and nonexertional physical impairments in measuring a claimant's disability."  *Stunkard v. Sec'y of Health and Human Services*, 841 F.2d 57, 60 (1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987) (citing 20 C.F.R. Regulations No. 4, Subpt. P, § 404.1545(b)(1986))).[2]

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that

---

[2]
> Exertional impairments involve limitations on a claimant's ability to meet certain strength requirements of a job such as lifting or pushing and pulling.  20 C.F.R. § 404.1545(b).  Nonexertional impairments, on the other hand, involve limitations such as postural and manipulative impairments that do not affect a claimant's physical strength but may nevertheless prevent claimant from engaging in gainful employment.  20 C.F.R. § 404.1545(d).

*Stunkard*, 841 F.2d at 60.

Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 28-29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social

> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Acting Commissioner to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07; *see also Plummer v. Apfel*, 186 F.3d , 429 (3d Cir. 1999).  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . .

21

. the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").

An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or

22

her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).
Although the reviewing court has a "responsibility to 'uphold a
decision of less than ideal clarity if the agency's path may
reasonably be discerned,'" the decision can only be reviewed on the
basis of the rationale provided by the ALJ--the court "should not
'supply a reasoned basis for the agency's action that the agency
itself has not given.'"  *Christ the King Manor, Inc. v. Sec'y of
Health & Human Services*, 730 F.3d 291, 305 (3d Cir. 2013) (quoting
*Motor Vehicle Mfgrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto
Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Fargnoli v. Massanari*,
247 F.3d 34, 42 (3d Cir. 2001).

### IV. Discussion

As noted previously, Plaintiff asserts that the Acting
Commissioner's decision should be remanded because his RFC
determination is not supported by the record.  (Doc. 16 at 9.)
Plaintiff specifically points to the ALJ's finding that she is
capable of light work without medical evidence of record given her
complaints of pain in her lower extremities and examination
findings that support significant CRPS/RSD.  (Doc. 16 at 13.)
Defendant responds that substantial evidence supports the ALJ's RFC
assessment.  (R. 15.)  I conclude this matter must be remanded for
further consideration of Plaintiff's RFC.

"Residual functional capacity" is defined as that which an
individual can do despite the limitations caused by his or her

23

impairment(s)." *Hartranft*, 181 F.3d at 359 n.1.  As set out above, ALJ Staller concluded Plaintiff had the residual functional capacity to perform light work and was limited to occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, and she is prohibited from climbing ladders, ropes or scaffolds.  (R. 23.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

(20 C.F.R. § 404.1567(b).)

Plaintiff's claimed RFC error is based on her contention that the ALJ's rejection of the only opinion evidence related to physical limitations triggered a duty to develop the record and it was error for the ALJ to determine she could perform light work based on his own interpretation of the medical evidence despite evidence that Plaintiff cannot spend significant time on her feet as a result of CRPS/RSD.  (Doc. 16 at 10-14.)  This claimed error requires the Court to consider whether ALJ Staller relied on substantial evidence of record to determine Plaintiff was capable of walking and standing, off and on, for approximately six hours in an eight-hour day or sitting most of the time with some pushing and

pulling of arm or leg controls.  20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

The ALJ does not point to direct evidence of these abilities in his RFC assessment.  (R. 23-27.)  Because Plaintiff relates walking and standing limitations to CRPS/RSD and because Dr. Malayil is the pain specialist who treated this impairment, ALJ Staller's review of Dr. Malayil's records is relevant to the determination of whether he based his determination that Plaintiff could fulfill the requirements of light work on substantial evidence.

ALJ Staller acknowledges that Plaintiff testified she could not walk for more than ten minutes at one time without burning in her feet and legs.  (R. 24.)  In the single paragraph in which he discusses Dr. Malayil's treatment of Plaintiff, ALJ Staller acknowledges Dr. Malayil's pain management specialty and notes objective findings of "slight decrease in temperature of her right foot and mild discoloration," "sensitivity to light touch," "dorsiflexion and plantar flexion are within normal limits," "left ankle and foot is normal," "slightly increased sensitivity in her right foot," "range of motion within normal limits," "allodynia and hyperesthesia along the medial aspect of her feet," and "no discoloration or temperature changes."  (R. 26.)  ALJ Staller also notes that "her pain was relieved after receiving lidocaine treatment," "Claimant stated that ointment has significantly

25

improved her pain," "she is very happy with [the ointment's] effects," "Dr. Malayil noted that the claimant's pain continues to improve with lidocaine ointment," "she is doing better overall." (*Id.*)

ALJ Staller does not properly discuss probative evidence supporting Plaintiff's allegations of foot pain, the basis of her claimed walking and standing limitations (*see*, *e.g.*, R. 38): he understates Dr. Malayil's findings which could be construed as supportive of Plaintiff's claimed limitations; he overstates the relief received both because he does not acknowledge the relative nature of many of the statements and because he does not discuss complaints of worsening pain and nerve block effectiveness.  (R. 26.)  For example, where the ALJ noted that Plaintiff reported improvement with the use of lidocaine cream in April 2013, the ALJ does not discuss that this was a relative assessment in that she still rated the pain at 5/10 and Dr. Malayil noted that the pain was "still quite bothersome to her but she has at least now progressed to the point that she can wear slippers and shoes without much difficulty."  (R. 519.)  At the same visit, Dr. Malayil's plan included the notation that in the future he would transiton the Plaintiff from Percocet to a long-acting pain medication "once we have her pain somewhat under control" (*id.*), creating the inference that Plaintiff's pain, though improved from her March visit, was not under control and was expected to be a

long-term problem.  ALJ Staller did not discuss Dr. Malayil's assessment in April and May 2013 that nerve blocks were needed to address Plaintiff's pain (R. 519, 536) and in July 2013 he anticipated a plan where she would receive nerve blocks every three to four months (R. 530), again creating the inference that Plaintiff's pain was significant and Dr. Malayil expected problems of several months duration related to CRPS/RSD.  The ALJ does not discuss evidence that the initial May 31, 2013, nerve block provided some relief for just a little over a month.  (R. 530.)  He does not discuss objective evidence supporting complaints of worsening pain as in August 2013 when examination showed allodynia and hyperesthesia along the medial aspect of the right and left feet and Dr. Malayil planned to schedule right L3 and left L3 sympathetic nerve blocks which where administered on September 23, 2013.  (R. 533.)

These examples are probative of Plaintiff's ability to meet the standing/walking requirements of light work as of her date last insured, September 30, 2013, based on Plaintiff's correlation of her standing/walking limitations with her CRPD/RSD symptoms.  They indicate that Plaintiff had medically validated pain related to CRPS/RSD from at least March 2013 (R. 529) through September 2013 with evidence thereafter indicating that nerve blocks provided relief of varying degree and duration (*see*, *e.g.*, R. 526, 541), some worsening of her pain in early 2014 which was verified by

objective examination (R. 522), and the continuation of symptoms through July 2014 (R. 541).  Because "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted *or can be expected to last* for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), the expectation regarding Plaintiff's CRPS/RSD symptoms as of her date last insured is relevant.

This review of the record shows clearly that ALJ Staller did not address probative evidence as is required in this Circuit. *See*, *e.g.*, *Cotter*, 642 F.2d at 706-07.  Therefore, we cannot say his RFC decision is supported by substantial evidence and the case must be remanded for further consideration.[3]

---

[3] The parties engage in discussion of whether an ALJ must base the residual functional capacity determination on a medical opinion setting out the functional capabilities of the claimant: Plaintiff maintains that such an opinion is required pursuant to *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986), (Doc. 16 at 11-12; Doc. 21 at 1-6); Defendant contends Plaintiff's reliance on *Doak* is misplaced and a specific medical opinion setting out the functional capabilities found in the RFC is not necessary (Doc. 20 at 16 (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011); *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *Cummings v. Colvin*, 129 F. Supp. 3d 209, 215 (W.D. Pa. 2015)).

The Court need not resolve this argument here because, as discussed in the text, ALJ Staller's determination that Plaintiff was capable of light work is not supported by substantial evidence. As in *Doak*, this is a case where "[n]o physician suggested that the activity [Plaintiff] could perform was consistent with the definition of light work set forth in the regulations."  790 F.2d at 29.  This analogy is relevant to the parties' *Doak* argument in that *Doak* did not find the ALJ's decision wanting solely on the basis that no *opinion* supported the conclusion that the plaintiff

Further consideration must also include a reevaluation of Plaintiff's credibility regarding the CRPS/RSD symptoms in that ALJ Staller's reasons for finding Plaintiff less than fully credible are not supported by the record.  His assessment that Plaintiff's allegations concerning her limitations up to the date last insured were not consistent with objective findings in that "treatment of her physical impairments was routine and conservative in nature" (R. 27) cannot be considered an adequate evaluation of the credibility of Plaintiff's CRPS/RSD symptoms based on the Court's conclusion that ALJ Staller did not adequately review Dr. Malayil's

---

could do light work, but also on the fact that no *suggestion* from a physician did so either.  *Id.*  Insofar as "suggestion" carries the meaning "[s]omething that implies or indicates a certain fact or situation," *Oxford Dictionaries*, htt;://www.oxforddictionaries.com/us/definition/american_english/suggestion (last visited July 28, 2016), *Doak* should not be read to establish a categorical rule that an ALJ's RFC finding must be based on a medical opinion making the same finding.  Rather, reliance on "suggestions," if sufficient to satisfy the substantial evidence requirement, could satisfy an ALJ's obligation in crafting the RFC.  Construing *Doak* as essentially a substantial evidence case as *Cummings* did, 129 F. Supp. 3d at 215 (citing *Doty v. Colvin*, No. Civ. A. 13:80-J, 2014 WL 29036, at *1 (W.D. Pa. Jan. 2, 2014)), relieves perceived conflict with Third Circuit cases cited by Defendant.  While the facts of *Doak*, *Chandler* and *Titterington* differ, persuasive support for the Court's interpretation of *Doak* is found in *Titterington's* statement that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."  174 F. App'x at 11.  Although not precedential, it is highly unlikely that a panel of the Third Circuit Court of Appeals would make such a definite statement regarding the basis of an ALJ's RFC assessment if *Doak* held otherwise.

records.  The fact that Plaintiff has not "undergone additional
treatment, including physical therapy and surgical intervention"
(R. 27) related to CRPS/RSD is of no consequence unless it is shown
that such treatment is relevant to an assessment of the degree of
pain and functional limitations experienced by an individual
suffering from the condition at issue.  Without such evidence, the
treatment chosen by a specialist should generally not be assigned
meaning or merit by an ALJ.  ALJ Staller's discrediting of
Plaintiff's pain related to CRPS/RSD on the basis that she said her
pain significantly improved with lidocaine treatment (R. 27) is
unavailing for the reasons discussed above, *i.e.*, he did not assess
these statements in the relative context in which they were made
and qualified.  His discrediting of Plaintiff's claimed walking
limitation on the basis that she ambulates with a normal gait (R.
27 (citing Ex. 7F)) is also unavailing in that the evidence cited
relates to a November 19, 2012, orthopedic office visit with Najiah
Faour, D.P.M., where he noted that Plaintiff walked "with a normal,
non-antalgic gait" (R. 277) and the clear recognition of symptoms
related to Plaintiff's CRPS/RSD did not occur until Dr. Malayil's
March 2013 evaluation.  Moreover, Dr. Faour's gait notation is
ambiguous at best in that the same office notes contain Dr. Faour's
impression that Plaintiff had a left navicular fracture, *difficulty
in walking*, painful foot, and sprain of the left ankle and foot
(279).  While the relevance of any gait notations made in Dr.

30

Faour's office notes is doubtful because his assessments were made in the context of treating her ankle/foot injury suffered on November 18, 2012 (*id.*), other objective evidence of record suggests walking difficulty related to Plaintiff's CRPS/RSDF: in February 2013, Dr. Fignar recommended the use of a cane based on Plaintiff's complaints of right ankle worsening pain and instability.  (R. 348.)

The importance of the need for the ALJ to have established an adequate basis for the finding that Plaintiff was capable of performing light work as of the date last insured is particularly significant because, if she was capable of only sedentary work, the lack of transferable skills (which the VE confirmed (R. 49)) would have indicated a finding of disability pursuant to Medical Vocational Rule 201.14.  In deciding the ALJ's RFC assessment is not supported by substantial evidence, the Court is cognizant of the absence of a medical opinion supporting Plaintiff's claim of disability.  Defendant correctly notes that such a deficiency can be "'very strong evidence' that a claimant is not disabled."  (Doc. 20 at 18 (quoting *Lane v. Comm'r of Soc. Sec.*, 100 F. App'x 90, 95-96 (3d Cir. 2004)).  Noting the holding in *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (3d Cir. 1983), that the "Commissioner is entitled to rely not only on what the record says, but also on what it does not say," *Lane* pointed to the plaintiff's responsibility of providing evidence which shows, not just a diagnosis, but

functional limitations preventing performance of substantial gainful activity.  100 F. App'x at 96 (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)).  Here, although Plaintiff has not provided a medical *opinion* establishing the limitations she claims, the foregoing discussion shows that the record contains objective verification of Plaintiff's pain which inferentially supports her claimed functional limitations.  Importantly, the absence of a supportive opinion does not relieve the ALJ of his obligation to support his RFC with substantial evidence--the significance of this obligation here is highlighted by the fact noted previously that if he had found Plaintiff capable of only sedentary work, a finding of disability would follow.[4]

In sum, ALJ Staller has not supported his RFC with substantial

---

[4]  This is certainly a case where the remedial nature of the statute is appropriately considered.  The Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  606 F.2d at 406. Further, the Court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

evidence because he has not addressed all probative evidence and a reasonable mind could not find an adequate basis in his opinion to support the conclusion that Plaintiff was capable of walking/standing for six hours in an eight-hour day when her CRPS/RSD worsened in February/March 2013. *Richardson*, 402 U.S. at 401. Therefore, this matter must be remanded for further consideration.

## V. Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted. This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion. An appropriate Order is filed simultaneously with this Memorandum.

                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge
DATED: August 1, 2016